Case number 23-3200 Maher Hanna v. Pamela Bondi, oral argument 15 minutes per side. Counsel Gabara for the petitioner. Good afternoon. Again, Suzanne Gabara on behalf of Mr. Maher Hanna. Mr. Hanna is a Catholic Christian who was born in Iraq. He came to the United States in 1983 when he was 5 years old. He is married to a United States citizen and has a daughter who's born a young child who was born in the United States. Ms. Gabara, I'm sorry to interrupt you. Are you reserving any time for rebuttal? I don't have a note here. Two minutes. Yes, Your Honor. Okay, thank you. Thank you. Due to his criminal convictions, he sought cat protection on specific claims that when considered together, the argument is that he will face torture if returned to Iraq. The specific claims include his criminal history, his inability to travel to a as a Christian to a Christian area in Iraq, because he lacks Iraqi identification documents, his ties to the United States as an Americanized individual, lacking Arabic skills, and not having any family or community ties whatsoever to Iraq. The court in this case affirmed the immigration judge's denial that really focused on the fact that the judge's opinion was that the abuses were directed at Sunni Muslims, and there was little evidence that such abuses were directed to Chaldean Christians. This is page five of the administrative record two of the opinion itself is page three. However, in addressing Mr. Hannah's claim, really, the only time the board addressed his these distinct claims were in correlation or in relation to the possibility of Mr. Hannah being charged under Iraq's terrorism law and pretrial detention. However, Mr. Hannah has always argued that these characteristics, when considered in the aggregate, will lead to prolonged detention. When looking at the judge's opinion, this is page 59 of the record, when he actually recites these claims, he addresses them by the word or, and then says Mr. Hannah cannot produce evidence that he faces particularized threat of torture under any of these bases. Throughout the opinion, it's clear the judge wasn't considering them in the aggregate, and really the main focus was him as a returnee and as a Christian, and the comment about Iraq's terrorism law. However, when you look at these claims, it boils down to the following. Both sides agree, and the government concedes, and I'll get to which part of the record where the government concedes on this, that Mr. Hannah will be subject to screening, detention, and interrogation. Where the sides don't agree how long this detention will be, because a government expert, Dr. Rubin, says this is benign only to ascertain identity. Same thing with Dr., I'm sorry, Douglas Oliva, but Mr. Hannah's experts, to the contrary, they say this detention is prolonged, and documentary evidence shows prolonged detention, police and interrogation during prolonged detention, leads to torture, because torture is a common practice in Iraq. To where the government concedes, I would point out to page 802 of administrative record to where Dr. Rubin states, when a person lacks identity documents, the suspect may be detained until family members or friends could confirm their identity. That's not possible for Mr. Hannah, or until a search of government records could confirm their information. There is no data available to show what documents Mr. Hannah has, or any Iraq documents. The record's clear that he does not have any Iraqi identification documents. In a prior declaration, this is page 811 of the record, Dr. Rubin says, any detention would be benign and temporary, lasting only so long as it took security and intelligence officials to confirm the answers of the returnee. Again, there is nothing available for security forces to confirm, because Mr. Hannah departed from Iraq in 1983, has lived in the United States all his life, doesn't have any documents or family members to vouch for him or sponsor, and in that prior declaration, this is page 390, he says, it is natural that the Iraqi government will seek to assess returnees to ensure they pose no threat to Iraqi security, and in doing this assessment, detention is going to be prolonged. He doesn't have anything to support that he is who he is. Dr. Rubin again contends, on the same page, 390, deportees returning to Baghdad Airport and Erbil Airport are likely to be questioned only to ascertain who they are and the circumstances by which they left Iraq. Douglas Ollivant agrees with this, supporting Mr. Hannah's position regarding interrogation and detention, page 805, some returnees will not have Iraqi identification documents, Mr. Hannah, will be held in government custody until these documents can be used. Mr. Hannah, there's no documents to be produced for Mr. Hannah. He goes on to say, without government documents, they will not be able to freely move about the country. These statements that were ignored by the judge and the board don't refute Mr. Hannah's argument, in fact, support them, and country policy information notes cited by both sides, this is page 413, confirms that the, and I excuse the pronunciation, the Laissez-Passer, the one-time travel document that returnees get, gets confiscated upon arrival to the Baghdad Airport. Same report on page 410 says, a person will face considerable difficulty in making the journey between Baghdad and the Kurdistan region without an ID or a valid passport. That same report also said, without these documents, there is a real risk that a person is detained at a checkpoint until such time as security personnel are able to verify the person's identity. Page 411 of that- He does not have any relatives remaining in Iraq, is that correct? Or communitized, or any identification, or anything whatsoever to Iraq. So part of your argument appears to me to be this failure to consider all of those things in the aggregate. Can you tell us where in the BIA's decision you draw the conclusion that the BIA disaggregated and only looked at the individual claims separately as opposed to in the aggregate? So if you look at page 5 of the BIA opinion, the focus is on the Chaldean Christian abuses and how they correlate to the Sunni Muslims during the liberation of Mosul. So that's the first, the first time they address, and they're addressing Chaldean Christians here. And then if you, the next paragraph on that same page, when it talks about the remaining claims, it's in correlation of Iraq's terrorism laws. But again, the argument is not that Mr. Hanna is going to be charged under Iraq's terrorism law. That may be one factor, but it's the interrogation upon detention and that prolonged interrogation. And again, same page, they relied basically on the immigration judge's conclusion. And he says the public officials will not acquiesce or turn a blind eye to torture of Christians or returnees. So really the focus was Christians and returnees. That same page goes into page 6 of the record, indicating that there is no reports that they're charged under anti-terrorism laws or have been tortured. But again, can I ask you a question about that? I hear what you're saying that the paragraph that you've directed us to on page 5 concerning the characteristics, let's see which specific ones of Americanization, lack of identity documents, foreign criminal convictions, the BIA kind of talks about all of those together. And it's true that it says that he's unlikely to be charged under any laws or under the terrorism law based upon these things. But it seems to me that the point of that paragraph is that even that is not likely to happen. So there's no evidence of torture. I respectfully disagree because they largely relied on the immigration judge's decision. And when you look at the immigration judge's decision return, because the next paragraph on that next page, they acknowledge that the respondents submitted evidence that supports his claim. But again, they go to the judge's findings. When you look at the judge's findings, his focus was the returnees, the Christians and mainly the Christians. And there is really no analysis about these claims in the aggregate. The one time the judge actually addresses them, he uses the words or and then makes the finding that on any of these basis makes no, does never. And unless I missed, which I read that opinion many times, there is no comment or decision or finding as to what that would be if you address them in the aggregate. But counsel, I mean, sometimes we see a case where they say, well, you know, there's a slight possibility or whatever, and then the aggregate becomes important. But I think what the IJ was saying is that there's no reason to believe that he would be tortured under any of those allegations. When you can, the judge does recognize that the return to Iraq after many years, it's not going to be easy and it will be difficult. While the judge finds that that that does not rise to cap protection. This is where the aggregate must be considered because documentary evidence, human rights report, talk about the inability to freely move from one checkpoint to another, this arbitrary practice when you're at these separate checkpoints and there are men by different people. There is no standard practice as the type of identification you're going to get or you're going to be asked the inability of him to even get an identification without a sponsor. And again, government experts can see this, but they downplay the fact that, oh, this is going to be benign. Once they ascertain who he is, he's going to be let go. But they don't address as to what if they don't? What if someone like Mr. Hanna, who has no family, no sponsor, no community ties, no identification whatsoever, how will they ascertain who he is? Is there any, if counsel, is there any affirmative evidence about what happens to those people? So there is evidence in the country reports that talks about detention and talks about practices by the government during detention. Everybody agrees he's going to be detained. I'm sorry. No, I understand. Everybody agrees he'll be detained when he returns. The question is, how long? Your argument is basically that if there's prolonged detention, there's a very high likelihood that he's going to be tortured. So, and I understand that there's evidence that as soon as you clear it up with your documents or relatives or friends, they'll let you go. But I'm asking you, is there any evidence about what happens to these people who were returned and have no connections to the country? Well, according to Mr. Smith, while he wasn't qualified as an expert, that some returnees are never found or families have never been able to confirm what happened to them. There is really not enough data. There's also the lack of reporting. Some returnees were safe. Some returnees were able to obtain documents. But all of the ones that there was reports on were the ones that had some family connections, some documents. There is lack of data as to those that don't have family ties or identification documents. Rightly so, because there is nobody to look for them or to find them. The only data that we have is for those that remain in detention because they're questioned or interrogated. What happens to those individuals? And it's inhumane. There is no question as to the type of practices that happen to these individuals when detained. All right. Thank you, Ms. Gabbara. Thank you. I am over my time. Mr. Gannon. Thank you. May it please the court, Peter Gannon for the United States Department of Justice. The agency properly aggregated all of the sources of harm that petitioner claimed and the agency correctly found the petitioner failed to establish that it was more likely than not to experience harm rising to the level of torture or that any harm would be done by or with the acquiescence of public officials. So what's your answer? Oh, I'm sorry. I'll let you go. Go ahead. Go ahead. What is your response to Ms. Gabbara's point that the IJ in discussing all of these individual characteristics used or when talking about them and didn't talk about, hey, taken together, even though individually these things might not result in torture, but taken together, these five or six characteristics really could. What is what is your response on that point? Your Honor, I think there are two things worth noting. I think, first off, the aggregation requirement applies to sources of harm, not characteristics about the petitioner. But secondly, the immigration judge and the board both did make the sorts of statements at the ends of their analysis to show that they considered everything together and simply determined that the petitioner had not established the requisite likelihood of harm rising to the level of torture. It is true that the immigration judge and the board discussed each of those characteristics, but that's simply the agency doing its job fully. If the agency had ignored one of them, the petitioner would be arguing that, you know, reverse was warranted to have the agency address that. I'm sorry. What specific language are you pointing to when you say at the end of their decisions, their language reflects that they did aggregate? Certainly. So at the end of the immigration judge's decision, at administrative record page 61, the immigration judge says the record shows that there is little particularized threat of torture to respondent, whether from Daesh, the PMF, or from other government agents. The court thus finds the respondent has not carried his burden of showing it is more likely than not that he will be tortured by or with the acquiescence of the Iraqi government. The board made similar statements at the end of its analysis as well. When this court has discussed what constitutes aggregation in Saleh and Yusuf, those sorts of statements establish that the agency did correctly consider all of the sources of harm that the petitioner feared. Well, didn't Yusuf actually directly say that it must consider petitioner's claim in terms of the aggregate risk of torture language that's absent from those two opinions? You're absolutely right, Your Honor. The board did not use the word aggregate, but I don't think that this is some talismanic thing where unless the agency uses the word aggregate, it means that it didn't aggregate. Here we have the sorts of broad statements about what the agency considered and what the petitioner needed to prove. And we can tell that the agency did aggregate all of the sources of harm that petitioner fears. Well, isn't it the BIA's burden to explain its decision? And wouldn't it need to articulate whether it is doing that aggregation by intentionally saying and or intentionally saying now we turn to the aggregate of these? I mean, there are five or six things here that create the risk or intensify the risk of torture. And I'm not finding the aggregate language. I guess my concern is it appears that there is an assumption that because they talked about them, that's good enough. But I don't find that in the case law. I think the case law appears to require the BIA to actually state what it is doing, that it's considering things in the aggregate or it now turns to consider all these factors together, because that's the language from Marquis. That's the language from Yusef. Why isn't that necessary here? Well, Your Honor, I think, again, you're correct that there is not that word aggregate that would, I think, address your main concern. But I think when you look at what this court said in Saleh, which was following Abdullah Had and saying, well, what does constitute aggregation? Again, the this court looks to things like that conclusion, wrap up broad statement that all of these things have been considered in order to analyze overall in the aggregate, whether or not the petitioner had met his burden. I think that what the agency did here does show that it was aggregating these together. It's well taken that, again, it didn't use the word aggregate. It did specifically note some of or it did note petitioner's claims. But again, that's just the agency going through what he presented to it. This was not like what the court did, the board did in Abdullah Had, where in that motion to reopen, the board focused on the Chaldean Christian claim and didn't address everything else that the petitioner was claiming. I think here we do have indications from the board and the immigration judge that they were both considering all of the sources of harm that petitioner feared in the aggregate. What do you say about the problem of having no documents? Is there any affirmative evidence of. How how they treat people who show up in that situation? No, Your Honor. And as a petitioner's burden to establish that he merits cap protection, that gap in the evidence is is on him. But there is but there's other evidence. And the evidence is that he will be detained and he will be questioned. And if he submits the right papers, he'll be released. But we know he doesn't have those papers and we know as fact that he doesn't have anybody there. Yes, Your Honor, but I think we also have the petitioner's own experts, particularly Ville, who the immigration judge specifically relied on on this issue to talk about how in all of the returnees that that expert had spoken with. Who reported instances of temporary detention and inconvenience when trying to travel within the country, none of them reported any harm. And that there there was no real risk of torture, certainly not harm rising to the level of torture from difficulty to travel and a lack of documentation. Yes, Your Honor. OK, these are people who had no documents. People, returnees in again, I guess there's not this specific angle of, well, is he ever going to be able to obtain documents? Is he ever going to find someone to help him in these situations? But it's everyone that the expert looked to. This is on the IG's discussion of the issue is on page 60 of the administrative record. The expert's declaration is at page 289 of the administrative record. Isn't the difficulty that the standard, the way it is stated, is that each checkpoint that has this person will hold that person until they can prove their identity. And even if there is some lack of evidence of what they did to them, there is evidence in the record, isn't there, that the more prolonged a holding is, the more likely and the more consistently the evidence suggests there's torture. That's it's the prolongation. Right. And so if he doesn't speak the language and if he doesn't have any relatives there and if he doesn't have any identity papers, how does he get out at the very beginning when they are going to let him out when they're going to hold him until he brings those proof items to them? But he does not have them. Your Honor, I think. I mean, he doesn't have any. He doesn't have documentation. Right. I think the. That's a yes or no answer. I think he does not. My understanding is he does not, Your Honor, that there will be some documentation to facilitate his travel and return to Iraq, but that will not be a long term solution to this issue for him. I think, Your Honor, the issue of torture and prolonged detention, the evidence in the record more relates to Sunni Iraqis who are suspected to have ties to the Islamic State. The agency discussed how that is not going to be petitioner because for exactly the reasons that he's westernized that he doesn't have. He's very clearly not a member of the Iraqi Islamic State because he has been in the United States that that is not a concern that the Iraqi government is going to have with them. I think. Is there a problem with the proof on that? Because Daniel Smith was not admitted as an expert. No, Your Honor, I think the issue of whether or not he was qualified to be an expert is not one where the agency aired, even if the agency did air petitioner has not alleged or established prejudice. Even as a percipient witness, however, the immigration judge considered his testimony and weighed it against the other experts in the record. Again, one of whom was petitioner's expert who specifically spoke to the issue of what happens to people who lack documents at these checkpoints and that everyone that that expert had spoken with indicated that it was not much more than an inconvenience. Isn't it the BIA's burden when discussing an expert to to distinguish cases? My understanding is they said that, well, this expert has been qualified sometimes and not qualified other times. So there's no automatic qualification for him as an expert based on the cases in which he was qualified. Well, that's accurate. But doesn't that beg the question? If the BIA is responsible for looking at those cases and saying we are distinct from the case that granted him expert status on the following basis. And I don't see that anywhere in the BIA's decision or the AG's. Correct? No. Well, no, Your Honor, but I'm not sure I agree with what you're saying about how the board has to look at other instances where a witness was qualified as an expert or not. The board has a framework by which immigration judges should consider each witness presented as an expert. And immigration judges are empowered to determine whether or not that proposed witness, based on their knowledge, skill, experience, training or education, has the specialized knowledge to serve as an expert witness. Well, what about our McKee's decision in 23 that said, you know, when the BIA inadequately explains its decision to the point where we cannot determine whether it abused its discretion or acted arbitrarily and capriciously, we must remand for it to explain its reasons. So, Your Honor, I don't think that the agency inadequately explained why Mr. Smith did not deserve to be given the weight of an expert. The immigration judge was clear that he was considering Mr. Smith along with the other experts or the individuals who the declarations that did end up being experts. The immigration judge didn't say it was some question of, oh, well, he lacks the education or he's too unconventional. At administrative record page 159, the immigration judge discussed having a welder serve as an expert witness. But in the immigration judge's decision, he said that Smith lacked the background to organize and temper his opinions. And the judge applying for precedent simply found that in this case, Smith was not in a position to serve as an expert witness that would be helpful to assist the immigration judge. I believe Mr. Smith began at the start of his testimony to say that he had testified in about seven cases and in five or six of them, he qualified as an expert. In this court's decision, Yusuf Mr. Smith was proposed as a recipient witness, not as an expert witness. I think whether any given witness is going to pass that bar to get to be an expert is going to depend on the facts of that case, how they're presented to the court, how the voir dire goes. And I think it's just that the facts of that presentation and how the immigration judge feels about whether or not they will be helpful to them, that controls whether or not they should serve as an expert witness. It's not, well, you know, I've been an expert witness 75 percent of the time, so I should be allowed to be an expert witness all the time. It's a case by case determination that's just going to naturally depend on how the case plays out. But then then one wouldn't would expect an explanation for why the expertise was there in one case and lacking in another. I think, Your Honor, that the immigration judge gave us the explanation in this case, and I'm not sure that there's a way for anyone to look into the records of other cases where an individual has been an expert or not. But his decision wasn't. It didn't seem to me to be a decision that addressed particulars about the case. It was a general statement about his qualifications. Yes, Your Honor, and I think that under the board's case law, that that is what an immigration judge should be doing. They should be looking at the expert and how the immigration judge feels that expert will be able to speak to the issues in the case. Right. Go ahead. What I'm struggling with is that their explanation says. Any prior determination doesn't establish that he's entitled to be qualified as an expert witness in this case that has the standard backwards. The he's not claiming I was. The only reason I can get to be an expert here is because I've gotten to be an expert in other cases. He is. The standard is whether if the BIA is going to look at him as an expert, they need to distinguish the cases in which he was granted an expert status. And I'm assuming in those cases he filed expert reports. So the BIA ought to be in the position to be able to explain in the first instance. We do not think it's adequate here because we have this factual setting in this case and this factual setting was not present in the other three cases where you were qualified. It seems to me that's their burden. And I don't see it. They flip to the burden by saying you're not automatically qualified here when they should have said why he was not qualified relative to the times that he had already been qualified. If I may, your honors, I see my time is elapsed. I'll respond to that and then wrap up your honor. I think it is the burden on the petitioner to establish that his proposed witness is an expert. I'll start there. And then it's on the petitioner to present sufficient support in backing Smith as an expert that following Vardir, the immigration judge can determine whether or not Smith is an expert who will assist with the immigration justice decision in the case. Unless the petitioner provides, I guess, those other cases or something, I'm not sure that the immigration judge or the board is in a position, much less has any burden to say, well, these other cases you were found to be an expert, but you're not here. So, I think that's, it's still the petitioner's burden to establish that Smith would be an expert. I think even if the agency did err in not qualifying as an expert, there was no prejudice from it based on how the immigration judge considered Smith's testimony, considered the 3 other experts that the petitioner provided. And along with all the other evidence and in conclusion, substantial evidence supports the board's decision to deny petitioner cap protection. Thank you. Thank you. Your time has expired, but I do have, I just want to point of clarity as to that last point that you were making. Are you saying that neither the IJ or the BIA would have access to the documents from those other cases or documents or whatever it was that was used to qualify him or not to qualify him in those other cases, such that they could make the comparison that we're asking about? Is that what you were saying? Yes, Your Honor, the immigration judge and the board have what's in this record, which is what the petitioner gave to them to establish that Smith is an expert. That doesn't answer the question. I'm sorry, that doesn't answer Davis's question, because what she's asked, if they have to make an explanation as Malkesian requires as to what their reasoning was as to why he's not, then that would require them to distinguish existing written BIA precedent that admitted him and his expert report in prior cases. I don't understand how we can flip that burden. So, Your Honor, those other cases would be in other non-citizens case files and would not, as far as I'm aware, the board has never published a decision about Smith's credentials. So, unless the petitioner presents the qualifications that were presented in that other case, I think the difficulty is the immigration judge and the board are not able to look into other administrative records. Unless the board issues a published decision on the issue, there's no way for the immigration judge or the board to go rooting around looking for other times that Smith has testified. But they can read their decisions from those cases, right? Not unless it's published. Sorry, Your Honor, not unless it's a published decision. And I think it's just difficult where the immigration judge and the board have to analyze this based on what the petitioner brings in support of Smith's expertise. It's the petitioner's burden to do all that as part of proving his claim to cap protection. And without him bringing that, there's nothing that the immigration judge or the board, as the agency, can go looking for that because they have to rely on the record that is before them. And I think this record contains what the petitioner brought to them, what they considered, and what is now before this court. I hope that answers your question. Counsel, I mean, it's a little bit different in this context, at least in my mind, because you have the same body ultimately deciding these cases. With the same expert who is testifying to the same things. And in this case, the IJ's decision didn't delve into the testimony. It was an assessment of Smith's qualifications as an expert. And these were sort of general objective observations about his background and experience. So given that that's the context in which we're viewing this, it does seem strange to me that he would be qualified in one person who's being deported to Iraq's case. And then semi qualified in another and then not qualified in another when they're all dealing with the same basic issues in context. Your Honor, I think it's it's just kind of how expert witnesses work, I think, both in immigration court and outside that each time it's up to the fact finder to weigh whether or not the proposed witness is an expert who deserves to give an expert opinion. You know, if surely in most cases, experts are very, very dependent on the facts that are presented to them. And and, you know, OK, but if you have the basically the same situation and the same testimony and it's deemed expert in one case and not in another by the same body, the BIA, because these are getting to the BIA on appeal. And I know it's on a record, but it would seem very strange. It would seem very strange for this court to have a series of cases involving the same car defect. And and with the same experts testifying to the same alleged defects and same problems and for on appeal, this court to say, oh, he's qualified in that case. You know, the judge said he wasn't. Affirm that judge. Judge says he was here. Affirm that. Affirm that. And there be there be no consistency as to whether the qualifications that are presented satisfy the requirements for an expert. I think your honor that at the end of the day, this court and the board reviewing immigration judges reviews what the petitioner puts in front of them. And I think that, like, in this court's decision, Yusuf, where Smith was not presented as an expert, but as a, as a percipient witness, which is what he was afforded here. I think it's, it's simply an illustration of how in different cases, no matter how much we think they may look the same from a high level perspective, there are going to be differences. I'm not sure why the petitioner and Yusuf presented him as a percipient witness rather than seek to have him as expert. But that's how they did it there here. They sought to have an as an expert and the immigration judge said, I don't think in this case that you aren't being an expert for the reasons that the immigration judge described. And I, I think my understanding is that it would work the same and say, a district court where a judge. Different fact finders could reach different conclusions about different witnesses in different cases. It may look at a very high level, like, oh, these are all the same experts providing the same information in the same types of cases. But that's why we have fact finders analyze whether someone deserves to be an expert. It's not simply the witness shows up and says, hey, I was qualified last week in this court. So I should be qualified automatically in this court. The immigration judge looked at his, you know, what the petitioner presented in support of his expertise and said, in this case. You know, I already have 6 witnesses or 6 experts already. I don't think that your testimony for the specific qualifications that the immigration judge focused on. Merits the weight of an expert witness. Thank you, Mr. Gannon. Are there any other questions? Judge Strange or Judge Wine? No. Okay. All right. Ms. Gabbara for rebuttal. There is a couple of points I would like to make. There seems to be a contention by opposing counsel that Ms. Belkis-Wooley indicates that individuals without identification documents. We're safe and we're able to relocate without any problem. To the contrary, if you look at her declaration, page 282 of the record, she does state deportees to Iraq without documentation continue to face difficulty when moving freely, impeding their ability to relocate and face persecution. She says deportees, and this is the next page, 283, who do not carry proper documentation will face restriction on movement and further says they will face detention. So I'm not sure where is the finding that she may took the position that individuals without documentation are not able are able to relocate. Her opinion, very clear, is the opposite that they will be at risk of arrest. This is page 286. At risk of arrest and detention is a reality that deportees abroad will face starting at the airport. So I need to make sure that's clear on that. The next thing, very briefly, Mr. Smith, since that was the bulk of the remaining question to opposing counsel. A case, United States v. Dalit, 227F3-385, that talks about witness testimonies in closely related suits indicates competence. And in this case, this is the argument I was trying to make. You have this inconsistent decision when you've got someone who is testifying as an expert to facts that are virtually the same. You've got prolonged detention, torture, no identification, no ties. Virtually most Americanized returnees who have been in the United States for that length of time who fit into that category, Mr. Smith is able to attest. And the immigration judge here focused on his education. And education is but one factor. And you look at the standards, again, the word is or. Or education, experience, skill, knowledge are other factors that the judge can't rely on. And for this reason, I respectfully ask that the decision be vacated, that this case be remanded with the instruction that the all claims to be considered in the aggregate and for a reconsideration of Mr. Smith's qualification as an expert. Thank you. Thank you. Thank you, counsel, for your preparation and for your argument. The case will be submitted.